# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Twin City Carpenters Pension Master
Trust Fund, *et al.*,

                              Plaintiffs,

v.

Phantom Construction Services, LLC, *et al.*,

                              Defendants.

Civ. No. 13-857 (RHK/TNL)
**MEMORANDUM OPINION
AND ORDER**

Christopher L. Goodman, Amanda R. Cefalu, Anderson, Helgen, Davis & Nissen, P.A., Minneapolis, Minnesota, for Plaintiffs.

Kevin D. Hofman, Halleland Habicht PA, Minneapolis, Minnesota, for Defendants.

## INTRODUCTION

Defendant Phantom Construction Services, LLC ("Phantom") performs carpentry work in the Twin Cities area. In 2002, it agreed to be bound to a collective-bargaining agreement (CBA) obligating it to make contributions to Plaintiff Twin City Carpenters Pension Master Trust Fund (the "Fund") for work performed by its employees.[1] Phantom made the required contributions until it withdrew from the CBA in 2010, but it continued to perform carpentry work thereafter in the CBA's geographic area. As a result, the Fund

---

[1] The Fund is a multiemployer pension benefit fund, meaning it pools contributions from more than one employer on behalf of covered employees. See Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal., 508 U.S. 602, 605 (1993). Such funds are common in the construction industry, "where there [is] little if any likelihood that individual employers would or could establish single-employer plans for their employees." Id. (internal quotation marks and citation omitted). Although this action was commenced by both the Fund and certain of its individual trustees, for ease of reference they are referred to jointly as "the Fund."

asserted that Phantom had incurred "withdrawal liability" under the Employee

Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001 *et seq.*[2]   After

Phantom failed to pay, the Fund commenced this action, naming Phantom, Scott Steffen

(Phantom's founder and operator), and several affiliated entities as Defendants.   Presently

before the Court is the Fund's Motion for Summary Judgment.   For the reasons that

follow, its Motion will be denied.

## BACKGROUND

Viewed in the light most favorable to Defendants, the record reveals the following

facts.   Steffen and a partner, Thomas Rushing, formed Phantom as a limited liability

company in 1999, with Steffen serving as its "chief manager."   At the same time, the two

formed several affiliated entities also performing construction services – namely,

Defendants CR Facilities Services, LLC ("CR Facilities"), SJS Drywall, LLC ("SJS"),

Carver Commercial Doors, LLC ("Carver"), and J&J Holdings Group, LLC ("J&J").[3]   In

2000, Phantom, CR Facilities, Carver, and SJS were merged into J&J, with J&J

becoming each of those companies' sole member.   J&J acts as a sort of umbrella

company, with the remaining entities tasked with specific types of construction work on

---

[2] Withdrawal liability is liability imposed under ERISA on "employers that cease participation in a multiemployer pension plan," Waldner v. Carr, 618 F.3d 838, 842 (8th Cir. 2010) (citation omitted), in order to "counter the threat that voluntary employer withdrawals pose to the viability of underfunded multi-employer pension funds," Borntrager v. Cent. States, Se. & Sw. Areas Pension Fund, 425 F.3d 1087, 1089 (8th Cir. 2005).

[3] All of these entities (save Carver) actually were formed as corporations in 1998 but were later dissolved and replaced with limited liability companies of the same names (dropping "Inc." or "Corp." for "LLC").   (Carver, by contrast, was first formed as an LLC in 1999.)   Another Defendant, Wyaz Services, Ltd. ("Wyaz"), was formed in 2002; it provides consulting services on J&J's construction projects.

its projects – carpentry (Phantom), drywall (SJS), clean up (CR Facilities), etc. – and their revenue filtering through J&J.[4]  Steffen bought out Rushing's interest in J&J in 2004 and became its sole member.

Through 2004, Tim Pauly served as the bookkeeper for J&J and its affiliates and also was responsible for corporate documentation, including annual corporate renewals required to be filed with the Minnesota Secretary of State under Minnesota Statutes § 322B.960.  According to Pauly, even though Phantom, CR Facilities, Carver, and SJS were merged into J&J in 1999, they maintained separate bank accounts and were separately collateralized, and he kept distinct accounting records for each.  In addition, each earned an annual profit during his tenure.  After Pauly left his job in 2004, Steffen continued to maintain separate bank accounts and records for the companies.  However, he did not know he was required to file annual renewals, and hence the Minnesota Secretary of State administratively terminated the companies in 2005.[5]  Steffen was unaware of this, however, and the businesses continued operating.

In the meantime, on September 10, 2002, Phantom signed an "independent Agreement" pursuant to which it agreed to be bound to the terms of a CBA between the North Central States Regional Council of Carpenters (the "Union") and the Carpentry Contractors Association.  One such term required it to make fringe-benefit contributions – for pension, vacation, health, and other benefits – on behalf of its Union employees

---

[4] Carver purchases doors, hardware, and other items at wholesale prices and resells them; it performs no installation or other construction services.

[5] "A domestic limited liability company that has not filed [its annual] renewal . . . is administratively terminated."  Minn. Stat. § 322B.960, subd. 4.

who performed carpentry work in the geographic area covered by the CBA.  It is undisputed Phantom employees performed such work over the ensuing years, and Phantom paid all required contributions to the Fund.[6]

In January 2010, Phantom informed the Union that it was "terminating the collective bargaining agreement" as of May 1, 2010.  Nevertheless, it continued to perform carpentry work covered by the CBA until well into 2012.  Accordingly, in September 2012 the Fund wrote Phantom and demanded it pay $219,100 in withdrawal liability, in 28 quarterly installments of $9,263.[7]  Phantom requested review of the Fund's calculation, and the Fund responded in January 2013 that its "actuary has reviewed the calculation . . . and has not found any error."  Phantom failed to remit any of the required monthly installments thereafter.

In April 2013, the Fund commenced this action against Phantom and Steffen, asserting that Phantom was liable for the withdrawal liability and Steffen also was liable because Phantom had been administratively terminated in 2005, rendering him a "sole proprietor" when providing carpentry services under the Phantom name.  (Compl. ¶¶ 30, 36.)  In response, Phantom acknowledged it owed the amount calculated by the Fund, plus interest, liquidated damages, attorney fees, and costs.  (See Answer (Doc. No. 7) ¶ 23.)  But it and Steffen disputed that he shared any responsibility for the withdrawal

---

[6] The Fund sued Phantom in 2008 for delinquent contributions, but it subsequently paid the outstanding amount and the Fund voluntarily dismissed the action.  See Moore v. Phantom Constr. Servs., Civ. No. 08-5075 (JRT/SRN).

[7] ERISA mandates that withdrawal liability be paid quarterly, in accordance with a complex formula for determining the amount of the liability.  See 29 U.S.C. § 1399(c)(1)-(3).

liability.  Indeed, according to Steffen, he was surprised by the Complaint's allegation that his companies had been administratively terminated and so, shortly after being served with process, he retroactively reinstated all of his companies by filing the required forms and paying the required fees.[8]

Discovery then commenced, during which the Fund learned about Steffen's other companies identified above (SJS, CR Facilities, Commercial Door, J&J, and Wyaz) and the services they performed.  It then amended its Complaint to name these additional entities as Defendants, asserting that they, too, were jointly and severally liable for the withdrawal liability because they were under Steffen's "common control."  (2d Am. Compl. ¶¶ 56-57.)  The Fund also added a claim against Steffen to pierce the veil of all these companies, alleging he used them as a "mere facade for [his] individual dealings." (Id. ¶ 77.)  In response, the corporate Defendants acknowledged responsibility for Phantom's withdrawal liability, but both they and Steffen continued to maintain he could not be held personally responsible for it.

With discovery complete, the Fund now moves for summary judgment.  Because the corporate Defendants have acknowledged their shared responsibility for the amount of withdrawal liability assessed by the Fund (plus interest, liquidated damages, fees, and costs), the only remaining issue is whether Steffen may be held personally liable for that amount.  The Motion has been fully briefed and is ripe for disposition.

---

[8] "If a limited liability company is administratively terminated . . ., it may retroactively reinstate its existence or authority to do business by filing a single annual renewal and paying a $25 fee." Minn. Stat. § 322B.960, subd. 5.  Doing so "returns [it] to active status as of the date of the administrative termination." Id., subd. 5(a)(1).

## STANDARD OF REVIEW

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Ricci v. DeStefano, 557 U.S. 557, 586 (2009). The movant bears the burden of showing the material facts in the case are undisputed. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (*en banc*); Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Beard v. Banks, 548 U.S. 521, 529-30 (2006); Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Fed. R. Civ. P. 56(c)(1)(A); Wood v. SatCom Mktg., LLC, 705 F.3d 823, 828 (8th Cir. 2013).

## ANALYSIS

The Fund proceeds against Steffen on two different tacks. On one, it attempts to impose withdrawal liability *directly under ERISA*, asserting Steffen became a sole proprietor once his companies were administratively terminated, rendering him an "employer" responsible for unpaid contributions. (See Pl. Mem. at 24 ("[A]fter [the companies] were dissolved, Steffen became the employer for purposes of assessing withdrawal liability. As such, [he] is personally liable.").) On the other tack, the Fund seeks to impose liability *indirectly*, based on Steffen's (alleged) status as an alter ego. It

contends he abused the corporate form and that his companies were mere shells for his individual dealings, rendering him responsible for all of their debts, including Phantom's withdrawal liability.  (See id. at 28.)  The Court addresses each contention in turn below.

## I.      Direct ERISA liability

Under ERISA, benefit contributions must be made by "employers" on behalf of employees performing covered work under a CBA.  29 U.S.C. § 1145 ("Every *employer* who is obligated to make contributions to a multiemployer plan under the terms of . . . a collectively bargained agreement shall . . . make such contributions in accordance with the terms and conditions of . . . such agreement.") (emphasis added).  The obligation to pay withdrawal liability similarly extends to "employers":  "if an *employer* withdraws from a multiemployer plan . . . , then the *employer* is liable to the plan in [an] amount to be determined."  § 1381(a) (emphases added).  To determine who is liable for withdrawal liability, therefore, the first step is identifying the "employer."

Here, it is undisputed Phantom employees performed covered work after the company withdrew from the CBA in 2010.  According to the Fund, however, because at that time Phantom (and its parent J&J) had been administratively terminated by the Secretary of State, Steffen was operating each company as a sole proprietorship.  And as a result, it argues that he, not Phantom, was the "employer" and is personally accountable for withdrawal liability under 29 U.S.C. § 1301(b)(1), which provides that "[a]n individual who owns the entire interest in an *unincorporated trade or business*" is an "employer" under the statute.  (See Pl. Mem. at 23 (emphasis added).)

While superficially appealing, this argument falters because Phantom did not become an "unincorporated trade or business" after its administrative termination in 2005. That conclusion necessarily flows from the holding in Lyman Lumber Co. v. Favorite Construction Co., 524 N.W.2d 484 (Minn. Ct. App. 1994). There, the plaintiff had obtained a judgment against the defendant corporation, but when it later sued to enforce the judgment, it discovered the defendant had been administratively dissolved for failing to file annual renewals. The district court dismissed the action, concluding that administrative dissolution meant the corporation was "dead," had "ceased to exist," and therefore "was not subject to suit." Id. at 486. The Minnesota Court of Appeals disagreed and reversed, after carefully parsing through the Minnesota Business Corporation Act. In particular, the court focused on "[t]he fact that an administratively-dissolved corporation can be retroactively reinstated." Id. at 488-89. "[R]etroactive reinstatement of a corporation," noted Lyman, "'returns the corporation to *active status* as of the date of the statutory dissolution.'" Id. at 489 (quoting Minn. Stat. § 302A.821, subd. 6(1)) (emphasis in original). "The term 'active status' implies that the corporation had some status, an 'inactive status,' during the period of administrative dissolution." Id. As a result, the defendant remained amenable to suit because it continued to exist in some corporate form following dissolution. Id.; see also, e.g., MultiStack LLC v. Arctichill Inc., No. 05 Civ. 3865, 2006 WL 510506, at *4 n.9 (S.D.N.Y. Mar. 1, 2006) (interpreting Minnesota law); Manty v. D56, Inc. (In re Brose), 339 B.R. 708, 714-15 (Bankr. D. Minn. 2006).[9]

---

[9] But see Carlson v. City of Duluth, 958 F. Supp. 2d 1040, 1054 (D. Minn. 2013) (Davis, C.J.,

So too here.  Like the Minnesota Business Corporation Act, the Minnesota Limited Liability Company Act provides that reinstatement "returns the limited liability company to active status as of the date of the administrative termination."  Minn. Stat. § 322B.960, subd. 5(a)(1).  As in <u>Lyman</u>, the statute's use of the phrase "active status" suggests that an administratively terminated limited liability company still enjoys "some status, an 'inactive status,' during the period of administrative [termination]."  524 N.W.2d at 489.  Accordingly, Phantom did not become a sole proprietorship, and Steffen did not become the "employer" of its employees, after administrative termination in 2005, because he did not own "the entire interest in an *unincorporated* trade or business."  29 U.S.C. § 1301(b)(1) (emphasis added).[10]

## II.    Veil piercing

The Fund next argues that even if liability cannot be imposed on Steffen directly under ERISA, he is nevertheless liable because Phantom – and each of his other limited liability companies – was merely his alter ego.  Generally speaking, "a member, governor, manager, or other agent of a limited liability company is not, merely on account of this status, personally liable for the acts, debts, liabilities, or obligations of the . . . company."  Minn. Stat. § 322B.203, subd. 1.  In "limited circumstances," however, a

---

adopting Report & Recommendation of Brisbois, M.J.) (concluding that administratively dissolved corporation "no longer exists under state law" and subsequent operations are undertaken "as a sole proprietorship").

[10] For this reason, the Court need not reach Steffen's alternative argument that even if Phantom became a sole proprietorship in 2005 (thus making him an employer), he reversed that status through retroactive reinstatement in 2013, shortly after this lawsuit was filed, or the Fund's retort that retroactive reinstatement should be ignored because it was undertaken only to avoid personal liability.  Nor need the Court reach Steffen's argument that he cannot be liable because he did not receive notice of withdrawal liability, which the Fund (allegedly) provided only to Phantom.

court may "disregard the corporate entity, or pierce the corporate veil, and hold a shareholder personally liable for what would otherwise be the debt solely of the corporation." Malcolm v. Franklin Drywall, Inc., Civ. No. 06-4155, 2009 WL 690082, at *1 (D. Minn. Mar. 12, 2009) (Magnuson, J.).[11]  The rule is no different in ERISA cases. See, e.g., Minn. Laborers Health & Welfare Fund v. Scanlan, 360 F.3d 925, 928 (8th Cir. 2004) ("[C]orporate officers cannot be held personally liable under ERISA [unless] there is [a] basis for piercing the corporate veil.").

Under Minnesota law,[12] a court may pierce a corporation's veil when (1) it is an individual's "alter ego" or "instrumentality" and (2) there exists "an element of injustice or fundamental unfairness."  Victoria Elevator Co. of Minneapolis v. Meriden Grain Co., 283 N.W.2d 509, 512 (Minn. 1979); accord, e.g., Malcolm, 2009 WL 690082, at *1.  The first prong requires the Court to consider the relationship between the individual and the company, evaluating "the extent to which the corporation was operated as [the

---

[11] Though Malcolm and other cases cited here involved corporations, "[t]he case law that states the conditions and circumstances under which the . . . veil of a corporation may be pierced under Minnesota law also applies to limited liability companies."  Minn. Stat. § 322B.303, subd. 2.

[12] It is unclear whether state or federal law governs veil-piercing in a federal-question case. Compare, e.g., Pillar Capital Holdings, LLC v. Williams (In re Living Hope Sw. Med. Servs., LLC), 509 F. App'x 578, 584 (8th Cir. 2013) (per curiam) (utilizing state law for veil piercing in bankruptcy action); and Carpenters & Joiners Welfare Fund v. Wayne, Civ. No. 02-779, 2003 WL 21730105, at *3 (D. Minn. July 21, 2003) (Ericksen, J.) (applying state veil-piercing law in ERISA action), with, e.g., Scanlan, 360 F.3d at 928 (applying federal common law to pierce veil in ERISA case).  Regardless, the Court applies Minnesota law here because both parties have cited it and have not asked for the application of any other law.  See BBSerCo, Inc. v. Metrix Co., 324 F.3d 955, 960 n.3 (8th Cir. 2003) (forum law applies when choice-of-law issue not raised).  The Court notes, however, that the factors considered under federal common law – whether (1) there existed "such unity of interest and lack of respect given to the separate identity of the corporation" and (2) "adherence to the corporation fiction [would] sanction a fraud, promote injustice, or lead to an evasion of legal obligations," Scanlan, 360 F.3d at 928 – are similar to those considered in Minnesota.

-10-

individual's] 'alter ego.'"  Malcolm, 2009 WL 690082, at *1 (citation omitted).  Factors

relevant to this inquiry include "insufficient capitalization for purposes of corporate

undertaking, failure to observe corporate formalities, nonpayment of dividends,

insolvency of [the] corporation at [the] time of [the] transaction in question, siphoning of

funds by [the] dominant shareholder, nonfunctioning of other officers and directors,

absence of corporate records, and [the] existence of [the] corporation as merely [a] facade

for individual dealings."  Id. (alterations added) (quoting Victoria Elevator, 283 N.W.2d

at 512).  The second prong looks at whether the corporate entity has been "operated as a

constructive fraud or in an unjust manner."  White v. Jorgenson, 322 N.W.2d 607, 608

(Minn. 1982).

       Here, the Fund points to the following in an effort to show Phantom's (and J&J's)

veil should be pierced and withdrawal liability assessed against Steffen personally:

- Steffen and Rushing contributed only $50 each to initially capitalize J&J;

- J&J contributed only $100 to capitalize each of Phantom, CR Facilities, and SJS;

- Steffen formed Wyaz solely as a vehicle for reimbursement of personal medical and dental expenses;

- None of Steffen's limited liability companies owns (or has owned) any assets, such as construction materials, tools, and the like, meaning they were insolvent;

- None of the companies held regular meetings or had other active members, and no minutes of business decisions were recorded in corporate records;

- Ford and Honda vehicles used for Phantom and J&J work were owned personally by Steffen, but were paid for by Phantom;

-11-

- J&J took deductions in its tax filings for tools and automobiles despite ostensibly owning no assets;

- Phantom thrice paid the property taxes on Steffen's home and his personal Cabelas Visa bill;

- Steffen made a series of undocumented loans through his businesses, some of which he could not explain in his deposition; and

- Steffen repeatedly received money from Phantom but did not record the transactions in Phantom's ledger using its "QuickBooks" accounting software.

(See Pl. Mem. at 6-19.)  To be sure, some of these items could support the conclusion that Steffen was abusing the corporate form and utilizing his companies as mere alter egos.  But in the Court's view, the record does not ineluctably lead to that conclusion.

Indeed, Steffen has offered explanations for many of the above items, as well as additional facts casting doubt whether the veil should be pierced.  For example, he points out that although he initially contributed only a small sum to capitalize his companies, it is undisputed they were repeatedly profitable and, for the most part, paid their bills on time over a period exceeding 10 years.  Only when the economy faltered in 2008 and 2009 did the companies experience financial problems, although they still managed to pay their bills.  See Malcolm, 2009 WL 690082, at *2 (declining to pierce veil when defendant's "financial woes stemmed primarily from credit and cash-flow problems rather than from undercapitalization"); Assoc. of Mill & Elevator Mut. Ins. Co. v. Barzen Int'l, Inc., 553 N.W.2d 446, 450 (Minn. Ct. App. 1996) (reversing determination veil should be pierced against corporation that was insufficiently capitalized, where owner "infused [the corporation] with capital from time to time").  That the companies were

-12-

able to pay their bills also calls into question the Fund's assertion that they were

insolvent.[13]  Moreover, while certain corporate formalities were ignored, it is undisputed

separate books were kept for each of Steffen's businesses.  Though no other members

actively participated in the companies' affairs, this "is not inconsistent with [the

operation of a closely held] corporation" and does not favor veil piercing.  U.S.

Consulting, LLC v. Roggatz, No. A12-0325, 2012 WL 6554435, at *5 (Minn. Ct. App.

Dec. 17, 2012).[14]  And, while the Fund accuses Steffen of "siphoning" assets, many (if

not most) payments to him or on his behalf were documented in the records of his

companies.  See Bank of Montreal v. Avalon Capital Group, Inc., 743 F. Supp. 2d 1021,

1031 (D. Minn. 2010) (Davis, C.J.) (no siphoning where loans and payments were

"properly accounted for").

    At bottom, whether an individual utilized a corporation as his alter ego "presents

primarily an issue of fact," United States v. Advance Mach. Co., 547 F. Supp. 1085, 1093

(D. Minn. 1982) (Renner, J.), amenable to resolution at summary judgment "when only

one inference can be drawn from the" record, Over-the-Road, City Transfer, Cold

Storage, Grocery & Mkt. Drivers, Helpers & Inside Employees Union v. Golden, Inc.,

No. C0-97-430, 1997 WL 536958, at *2 (Minn. Ct. App. Sept. 2, 1997).  Because of the

---

[13] The Fund relies upon the Minnesota Fraudulent Transfer Act's definition of "insolvency," namely, whether "the sum of the debtor's debts is greater than all of the debtor's assets."  Minn. Stat. § 513.42(a).  As none of Steffen's companies purport to own any assets, they would (obviously) meet this definition.  Yet, "the term 'insolvency' has *two* commonly accepted definitions," one of which is "the inability of a debtor to pay its debts as they mature."  15A Fletcher Cyclopedia of Corporations § 7360 (emphasis added).  And here, the evidence indicates that Steffen's companies generally were able to pay their bills on time.

[14] In any event, "in a closely-held corporation, failure to observe corporate formalities is not sufficient" to pierce the veil.  U.S. Consulting, 2012 WL 6554435, at *5.

fact-intensive nature of the inquiry, veil piercing "should not normally be disposed of by summary judgment."  <u>Ahlm v. Rooney</u>, 143 N.W.2d 65, 69 n.1 (Minn. 1966).  That is the case here – the record simply does not show, as a matter of undisputed fact, that Phantom and J&J were Steffen's alter egos.  Summary judgment must therefore be denied.

CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, it is

**ORDERED** that the Fund's Motion for Summary Judgment (Doc. No. 35) is **DENIED**.

Date:  May 28, 2014                          <u>s/Richard H. Kyle</u>
                                             RICHARD H. KYLE
                                             United States District Judge